UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Crim. No. 4-44-B-W |
| | ) |
| DAREN J. CLARK, | ) |
| | ) |
| Defendant | ) |

**Recommended Decision**

Daren J. Clark, a Connecticut resident and convicted felon, is charged in an indictment with possession of a firearm by a felon in connection with a night hunting incident in Maine in November 2003. Clark allegedly possessed a .22 caliber Marlin rifle, identified by its serial number, during the night hunting incident. In January 2004 Connecticut officers executed a search warrant at Clark's residence in East Hartford based in large part upon the probable cause developed in connection with the Maine investigation. While failing to locate the .22 caliber rifle, other firearms were found, forming the basis of state charges in Connecticut for which Clark was arrested at the time of the search. Additionally, Clark made certain incriminating statements both to a Maine investigator present at the scene and, separately, to two Connecticut law enforcement officers. Clark has moved to suppress those statements as obtained in violation of the <u>Miranda</u> rule. An evidentiary hearing was held before me on May 7, 2007. I now recommend the court adopt these proposed findings of fact and deny, in part, the motion to suppress, but grant the motion to the extent it seeks suppression of certain unwarned statements made by Clark while seated at his kitchen table.

**Proposed Findings of Fact**

Philip Dugas is a Warden Investigator for the Maine Warden Service. In that capacity he became aware of the fact that in November 2003 Warden Mark Merrifield conducted an undercover investigation into fish and wildlife violations in Ashland, Maine. The primary target of the investigation was Eric Argraves. During the investigation, Warden Merrifield developed probable cause to believe that Daren Clark, a felon and one of Argraves's acquaintances, had possessed a firearm during night hunting incidents on November 3 and 4, 2003. In January 2004, relying upon information Warden Merrifield gathered during his undercover investigation, the Maine Warden Service executed a number of search warrants, including at Argraves's residence. Because Clark lived in Connecticut, Maine officials asked for the assistance of the Connecticut Department of Environmental Protection and Connecticut State Police. Dugas was assigned to assist the Connecticut authorities who decided to use the probable cause developed in Maine to seek a search warrant for Clark's residence.

On January 14, 2004, Dugas accompanied a search team to the mobile home of Daren Clark in East Hartford, Connecticut. After officers of the Connecticut State Police Firearms Task Force had made entry and secured the firearms, Dugas entered the residence with their permission. He knew that the .22 caliber Marlin rifle had not been discovered in the residence. When he entered the mobile home Daren Clark was seated at the kitchen table chatting casually with Sgt. Darren Edwards of the Connecticut State Police. Clark was smoking a cigarette. Dugas sat down at the table, identified himself and showed Clark his credentials from Maine. Dugas informed Clark he did not have jurisdiction to arrest him in Connecticut, but he wanted to talk with him about the Maine incident and the .22 caliber Marlin rifle. Dugas also advised him that he had four summonses from the State of Maine for Clark, but he was under no obligation to

accept service of those summonses. Dugas did not advise Clark of his Miranda rights. Clark was cooperative and indicated he was willing to talk with the officer and accept service of the Maine summonses. He asked a number of questions about how he needed to respond to the summonses and whom he needed to contact. Dugas did not threaten or physically restrain Mr. Clark, pull his weapon or make a show of force. Clark was completely cooperative throughout.

Dugas asked Clark about the .22 magnum rifle. Clark admitted he went night hunting with Argraves and the undercover officer on November 3 and acknowledged he used the rifle to shoot a deer in the head that night. Clark denied deer hunting on the following night, although he admitted to riding in the vehicle with the other two. After interviewing Clark, Dugas left the mobile home. Local officers then formally arrested Mr. Clark on Connecticut charges.

Darren Edwards is a recently retired Connecticut State Police sergeant with twenty-four years experience. He was the departmental expert on firearms laws for 10 years and served as a Supervisor for the last eight years of his tenure. For the last four years prior to retirement, he was Commanding Officer of Firearms Task Force. During that time, he participated in approximately 50 firearms-related search warrants.

On January 14, 2004, Edwards was the supervisor of a seven-person team that executed the search warrant at the home of Daren Clark in East Hartford, CT. The Maine Warden's Service had asked the Connecticut Department of Environmental Protection (DEP) for assistance with an investigation because they had probable cause to believe that Clark possessed firearms despite his felony status. DEP in turn asked the Connecticut State Police Firearms Task Force for assistance because firearms were to be seized if they obtained a search warrant. The final search team included two Conservation Officers from DEP, one Maine Warden, and four officers from the Firearms Task Force.

Because of the risk to officer safety associated with the presence of firearms, the Task Force officers making the initial entry secured all persons in the residence before proceeding. Frequently, all persons are handcuffed until the firearms have been located. Six Task Force agents made entry into Clark's residence and found Clark and members of his family inside. Immediately upon entering, Edwards asked Clark where the firearms were located. Clark said they were in a case in the hallway. Because he and the others in the residence were cooperative from the outset, and because the officers found all the firearms where he said they would be, neither he nor any other person was handcuffed, although all of them were restrained in the sense that they were frisked, told where to sit and were prevented from moving around within the house. Aside from the initial rapid entry[1], the officers made no other show of force. They did not threaten Clark, coerce him or physically restrain him.

After the firearms were recovered from the hallway case, Clark said that some of the firearms belonged to another person in his family, not him. Edwards then asked him which guns were his and which belonged to someone else, which Clark explained to Edwards. Aside from asking Clark where the firearms were located when first entering the residence, and asking him which firearms were his after he said some belonged to another person, Edwards did not ask Clark any other investigative questions. Clark was cooperative throughout the search of his residence. After recovering and securing the firearms from the hall cabinet, Edwards noticed that one was similar to a gun he had recently purchased. Clark and Edwards discussed that particular type of firearm casually and also discussed hunting. Clark had a Maine Big Buck Club plaque on his wall indicating that he had shot a buck weighing more than 200 pounds. That fact

---

[1] The police report describes it as an "initial rapid entry." At the hearing the Connecticut officers testified they knocked and were admitted by one of the residents and there was nothing untoward about the entry. I do not think those two statements are inconsistent and the manner of entry is not an issue in any event. A search team involving six officers in search of firearms would enter a residence rapidly and with a clear focus. A reasonable person would view the entry as a show of force.

was also discussed.  Edwards did not ask Clark any questions about the Maine case or the .22 caliber Marlin.

As Edwards and Clark were sitting at the kitchen table having this casual discussion, Maine Warden Philip Dugas, who had been waiting outside, entered the residence and interviewed Clark.  When Warden Dugas began his interview, Edwards stood within earshot.  In Edwards's view Clark was continuing to be cooperative throughout the interview.  After Warden Dugas was done interviewing Clark, the Connecticut officers arrested Clark on Connecticut charges of criminal possession of a firearm because he was a felon at the time of the search and had guns in his possession.  He was transported by members of the Firearms Task Force to the State Police barracks, where Trooper David Hickey advised him of his <u>Miranda</u> rights, obtained a written waiver and interviewed him.

David Hickey has been employed by the Connecticut State Police since January 1998.  In June 2002 he was assigned to the Statewide Firearms Trafficking Task Force, where he has worked ever since.  During his service with the Firearms Task Force, he participated in dozens of firearms search warrants.  On January 13, 2004, Hickey received a call from Sgt. Enright of the Connecticut Department of Environmental Protection, Law Enforcement Division.  He informed Hickey that the Maine Warden's Service had asked for Connecticut's assistance in searching the East Hartford home of Daren Clark for firearms because an undercover investigation in Maine revealed that Clark, a felon, possessed firearms and used them to hunt illegally.  Because Hickey was assigned to the Firearms Task Force, Sgt. Enright asked him for assistance with the investigation and search warrant.

After receiving Sgt. Enright's call and talking to Maine Warden Philip Dugas, Hickey confirmed that Daren Clark lived at 42 Arapaho Drive in East Hartford, that he had been

convicted in Hartford Superior Court of felony possession of narcotics in 1989, that he had obtained a Connecticut hunting license in 2003, and that he had bagged a deer on November 27, 2003, indicating when he tagged the deer that he had used a rifle to kill it.  On January 14, 2004, Hickey swore out an affidavit and obtained a Connecticut state search warrant for Clark's residence.  He then participated in the execution of the warrant.

Upon entering the residence, Hickey found six people inside, including Clark, his wife, an adult male named Douglas Boyer, and three children. The adults were all frisked for officer safety.  Clark's wife was allowed to leave with the three children shortly thereafter.  Before she left the residence she had produced the keys to the gun cabinet.  Clark and Boyer remained.  During the search, Clark was completely cooperative and informed the officers where the firearms were stored.  The officers located three firearms in a locked case in the hallway, where he said they would be.  After Clark indicated that one of the guns belonged to Boyer, and Boyer provided proof of ownership, they left Boyer's firearm with him and seized the other two.  Hickey participated in a general conversation with Clark and Boyer about the ownership interests of the three guns.

Hickey did not participate in Dugas's interview of Clark at the kitchen table nor did he engage in the "casual chat" with Edwards and Clark.  After Dugas left the residence, Hickey formally arrested Clark on Connecticut state firearms charges and transported him to Troop H.  After they arrived at the barracks, Hickey advised Clark of his Miranda warnings.  Clark signed a written acknowledgment of rights and waiver.  After Clark waived his Miranda rights, he gave a voluntary statement.  Hickey committed that statement to writing and Clark signed it, initialing certain changes to the document.  The only statements that Clark gave to Hickey about the .22 Marlin rifle are contained in the written statement.  Hickey supplied the serial number of that

weapon to Clark based upon Hickey's review of the Maine investigative reports. Clark's statement indicated the .22 Marlin was purchased for his eight year old daughter to use when she becomes old enough. Clark told Hickey the rifle is kept in Maine at the Argraves's residence and has never been in Connecticut.

## Discussion

There are four discrete sets of statements that must be analyzed in this case: (1) the comments made to Edwards and Hickey regarding the location and ownership of the guns; (2) the "casual chat" with Edwards at the kitchen table; (3) the investigative interview conducted by Dugas in the kitchen; and (4) the post-Miranda statement to Hickey in the booking room. Clark maintains the first three sets of statements were obtained in violation of Miranda and the fourth statement should be suppressed because it is tainted by the earlier statements. Because Clark was not administered a prophylactic Miranda warning during the search of his premises, his motion to suppress will succeed to the extent that he was subjected to custodial interrogation. In other words, Clark must have been "in custody" when he made the statements he would have the court suppress and the statements must be the product of interrogation or its "functional equivalent." United States v. Lopez, 380 F.3d 538, 545 (1st Cir. 2004). For purposes of the Fifth Amendment, "in custody" means that the defendant has been formally arrested or has had his freedom of movement restrained to the degree associated with a formal arrest. United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996). Whether the restraint on movement is sufficient to rise to the level of an arrest depends on the objective circumstances and how they would be perceived by a reasonable person standing in the shoes of the suspect. Id. at 711. "Relevant circumstances include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical

7

restraint placed upon the suspect, and the duration and character of the interrogation." Id. (quotation marks and citation omitted). As for the "functional equivalent" of interrogation, the standard is whether "any words or actions on the part of the police [were] reasonably likely to elicit an incriminating response from the suspect." Id. (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).

*1.     The initial statements regarding location and ownership of the guns*

Upon initial entry into the home all of the occupants were frisked and asked to have seats. Clark, his wife, and Boyer all cooperated with the officers and told them where the guns were and assisted in obtaining a key to the cabinet.  While all six occupants remained in the apartment I think it is questionable whether the mere execution of the search warrant created a custodial setting, although there were certainly custodial aspects to it.  Nor do I think Boyer's chatter about his ownership of the one gun and the officer's attempts to follow up on that claim, which ultimately resulted in the release of the gun to him, was the functional equivalent of interrogating Clark.  During that initial period when the officers were locating, securing, and identifying the weapons in the home, it does not appear to me that a custodial interrogation occurred even though the officers were executing a search warrant on the premises and even though Clark joined with Boyer and his wife in responding to inquiries.  Cf. U.S. v. McCarty, 475 F.3d 39, 44-46 (1st Cir. 2007) (finding that no arrest occurred post search warrant execution and therefore the responses to interrogation post-search were not obtained in violation of Miranda).

However, even if the situation is viewed as custodial and the questions asked are viewed as interrogation, there is a public safety exception to Miranda articulated in  New York v. Quarles, 467 U.S. 649, 655-59 (1984).  This exception allows police to question an arrestee without first giving Miranda warnings if the police reasonably believe doing so will protect them

8

or the public from an immediate danger, like a nearby concealed weapon. Id. at 659. The Eighth Circuit has held that the public safety exception applies "so long as the questions asked of the suspect are reasonably prompted by a concern for the public safety," and that has been treated as including the safety of the officers involved in the situation. U.S. v. Williams, 181 F.3d 945, 953 (8th Cir. 1999) (internal quotation marks omitted). In Williams, the suspect was handcuffed in his apartment and the police had a search warrant. Before beginning to search, Williams was asked whether there was "anything we need to be aware of." Williams told the officers about a gun in the closet. This unwarned question was held not to violate Williams's Fifth Amendment rights because there might have been weapons in the apartment "that could cause [the officers] harm if they happened upon them unexpectedly or mishandled them in some way." In the same vein the initial questions about the location of the guns was well within that public safety exception.

The subsequent conversation about the ownership of the guns related primarily to sorting out Boyer's interest and did not result in incriminating statements in connection with the .22 caliber Marlin that is the subject of this indictment and which was not in the Connecticut mobile home. Therefore there is no reason that Clark's stray statements about his wife having the key to the gun cabinet, ownership of the various guns, or Boyer owning one of the guns need be suppressed.

2.   *The kitchen table "chat" with Edwards*

After the weapons were secured and Clark's wife and children were allowed to leave the premises, Clark's situation became custodial. Although Clark was not handcuffed, his movement was restricted in that he was compelled to remain at the kitchen table. There were at least six officers in the premises. Once his wife and children had been allowed to leave and he was

forced to remain behind, it would have been objectively reasonable to believe that his freedom of movement had been substantially restricted. No one told Clark he was not going to be arrested and indeed all of the available evidence suggests the Connecticut authorities were planning to arrest him for firearms violations and did so when they were ready. I am satisfied that at this point in time Clark was "in custody" within the meaning of Miranda. Even though he remained in his home and the tenor of the search had been entirely co-operative, it was apparent that Clark's freedom of movement had been substantially restricted.

At this point Edwards commenced the casual chat about hunting in Maine. I doubt whether Edwards, at that time, viewed the conversation about hunting in Maine as the functional equivalent of interrogation. In January of 2004 the "Maine investigation" involved night hunting charges and the "Connecticut investigation" involved possession of firearms by Clark within that venue. Federal firearms charges were not part of the picture. Nevertheless, Edwards steered this conversation to a topic (hunting in Maine for a "big buck" trophy, not night hunting) that ultimately yielded incriminating statements related to Clark's possession of a firearm, albeit not the .22 Marlin rifle, in Maine. Of course, the subjective states of mind of Edwards and Clark are irrelevant; the perspective to be considered is whether a "reasonable person" would view it as the functional equivalent of interrogation, statements designed to elicit incriminating responses. Ventura, 85 F.3d at 712. If the hypothetical reasonable person would have known that, ultimately, Clark would be charged with federal firearms offenses in the District of Maine there would have been no doubt in that person's mind that the "kitchen table chat" was designed to elicit incriminating statements.

Viewing the "kitchen table chat" from that perspective, there is no question in my mind that the statements by Edwards about hunting in Maine were the "functional equivalent" of an

interrogation.  Steering the conversation to the topic of hunting adventures in Maine was certainly likely to elicit incriminating responses from Clark, we now know with the benefit of hindsight.  Edwards admits to directing the conversation to these topics; the statements were not simply blurted out by Clark.  In my view, it would be a violation of Miranda for the Government to now use these unwarned statements against Clark.  I suspect that given the professional manner in which Edwards and Hickey conducted this search and subsequent interrogation, if Edwards subjectively believed he was interrogating Clark about the charges he would have provided a Miranda warning in these circumstances.  However, as some courts have repeatedly noted, it is not the subjective belief of either the officer or the suspect that governs the Miranda inquiry.

3. *The Dugas interview at the kitchen table*

There is no question but that Dugas conducted an investigative interview and did not administer Miranda warnings.  The sole issue is whether Clark was in custody or not by the time Dugas entered the mobile home and began talking to him.  Dugas apparently thinks that because he told Clark that *he* had no authority to arrest him in Connecticut, custody was not an issue.  However, that view ignores the six armed members of the Connecticut State Police Firearms Task Force who had taken control of Clark's house.  It also ignores the fact that Clark's wife and children had been told they could leave and were obviously not placed in custody, whereas Clark was left behind to speak with Dugas.  This case is really the mirror image of McCarty.  In that case a set of statements were obtained from McCarty after the police had finished the search and were in the process of leaving the residence.  One officer remained behind and sat on the sofa with McCarty and asked him some investigative questions.  Before doing so he informed McCarty that he was not going to be arrested that night and that he was free to leave the house

11

while the officers finished up their work.  In McCarty the custodial aspects of the search had dissipated, whereas here they were building to the crescendo of the formal arrest by Connecticut state troopers.  I am convinced the only reason Clark had not been formally arrested by the state troopers was as a courtesy to Dugas to allow him whatever questioning he wanted before they removed Clark from the residence.  The fact that Dugas was not involved in the ultimate decision to formally arrest Clark is irrelevant; the objective facts are that Clark's movement was substantially restricted, his home was overrun by six officers, and others had been told they could leave the residence but Clark had to remain seated at the kitchen table.  A reasonable person would believe the situation to be custodial.  Accordingly, the unwarned statements made to Dugas about the night hunting incident in Maine should be suppressed.

4.    *The statements provided to Hickey at the detention facility*

Clark relies upon Missouri v. Seibert, 542 U.S. 600 (2004), to support his argument that the written statement he gave to Hickey at the detention facility should be suppressed because it is the product of the prior unwarned statements made at the residence.  In Seibert the Court carefully distinguished, but did not overrule, Oregon v. Elstad, 470 U.S. 298 (1985).  Seibert involved a case where the police questioned a woman at the police station after she had been awoken at 3:00 a.m. and taken there by an officer.  The first interrogation, without Miranda warning, lasted for some time and finally Seibert made a damaging admission about her son's death in a fire.  She was then given a twenty minute coffee and cigarette break, received Miranda warnings from the same officer she had just spoken with, was then confronted with her pre-warning incriminating statements, and ultimately confessed to the crime.  In contrast, Elstad involved a situation where one officer had a brief, almost casual, encounter with the suspect at his home when he was taken into custody on charges of burglary.  The suspect made an

incriminating statement. Later at the station, after being fully apprised of his Miranda rights, the suspect made a full confession. The difference between the two cases was summarized thusly:

> The contrast between Elstad and this case reveals a series of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. In Elstad, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home; since a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the Miranda warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.

Seibert, 542 U.S. at 615-616.

In Clark's case the two unwarned statements at the home during the search are a total disconnect from Hickey's interrogation. Hickey had no interest in asking about hunting activities in Maine and his questions about the .22 Marlin rifle would have been asked even if Clark had told Dugas nothing about night hunting in Maine and had told Edwards nothing about bagging his trophy buck. Hickey knew there was a .22 Marlin in play from the Maine investigative reports before he ever obtained the search warrant. Hickey simply confirmed the existence of that gun and established that it had never been in Connecticut. He did not follow up about the November 2003 night hunting incidents. Nor did he question Clark about any of his hunting activities in Maine.

Any reasonable person in Clark's shoes, after being warned of his rights under Miranda, would have understood himself to be in a "new and distinct experience" from the one that took place at his house. There is no reason to believe that the written statement resulted from any coerced statements obtained from Clark earlier that evening. The two earlier statements,

13

although technically obtained in violation of Miranda and thus subject to suppression, see Dickerson v. United States, 530 U.S. 428 (2000), did not have any other unduly coercive aspects to them. For Clark the Miranda warnings did provide a genuine choice about whether he wanted to continue being cooperative, as he had been all evening, or change his mind and provide no further statements. The choice he made was voluntary and made with full knowledge of his rights.

## Conclusion

Based upon the foregoing I recommend the court grant the motion to suppress as to the statements made to Edwards and Dugas at the kitchen table. I further recommend that the motion be denied as to the preliminary statements regarding location of the guns, the key to the cabinet and the ownership of the guns within the cabinet and as to the written statement provided to Hickey at the detention facility.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

**Unless the district judge directs otherwise, the objecting party must promptly arrange for transcribing the record, or portions of it in accordance with Fed. R. Crim. P. 59(b)(2).**

Dated May 10, 2007                                             /s/ Margaret J. Kravchuk
                                                               U.S. Magistrate Judge